UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2004 MAR 24  A 10: 37
U.S. DISTRICT COURT
BRIDGEPORT CONN

------------------------------------------------ X
MITCHELL CAMPBELL,                        :
                                          :   DOCKET NO. 3:03CV0246(SRU)
                    Plaintiff,            :
                                          :
v.                                        :
                                          :
MAIN ENTERPRISES, INC.,                   :
                                          :   MARCH 24, 2004
                    Defendant.            :
------------------------------------------------ X

### AFFIDAVIT OF LAWRENCE PEIKES

STATE OF CONNECTICUT )
                     )  ss.:
COUNTY OF FAIRFIELD  )

LAWRENCE PEIKES, being duly sworn, deposes and says:

1. I am a partner with the law firm of Wiggin and Dana LLP in Stamford, Connecticut, and am admitted to practice before this Court. I am over the age of eighteen and fully understand the meaning and significance of an oath. This affidavit is submitted in support of defendant's motion in limine in the above-captioned case, and will serve to authenticate the deposition transcript excerpts cited in the accompanying memorandum of law.

2. Attached hereto at Tab A is a true and correct copy of excerpts from the transcript of the deposition of Mitchell Campbell, conducted on October 23, 2003.

3. Attached hereto at Tab B is a true and correct copy of excerpts from the transcript of the deposition of Susanne Ianniello, conducted on October 14, 2003.

_____
Lawrence Peikes

Subscribed and sworn to before me
this 23rd day of March 2004.

_____
Notary Public

My Commission Expires Feb 28, 2006

## CERTIFICATE OF SERVICE

This is to certify that on March 24, 2004, I caused the foregoing Affidavit of Lawrence Peikes to be served by hand on:

> Robert J. Sickinger, Esq.
> Cummings & Lockwood LLC
> 107 Elm Street
> Stamford, CT 06902

_____
Lawrence Peikes

\16130\1\84786.1

**COPY**

Page 1

1

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF CONNECTICUT

4  ------------------------------------------------x

5  MITCHELL CAMPBELL,

6

7                                  Plaintiff,

8              -against-         Civil Action No.

9                                3:03 CV 0246   (SRU)

10  MAIN ENTERPRISES, INC.,

11

12

13                                 Defendant.

14  ------------------------------------------------x

15                        October 23, 2003

16                        9:46 a.m.

17

18        Examination Before Trial of MITCHELL

19   CAMPBELL, taken by Defendant, pursuant to

20   court order, held at the offices of Wiggin

21   & Dana 400 Atlantic Street, Stamford,

22   Connecticut, New York, New York, before

23   Michele DiEdwards a Notary Public within

24   and for the State of New York.

25

Page 60

1          M. Campbell
2  these conversations that you just attested to
3  that Mr. Oppedisano cannot deny your reserve
4  obligation, was that something that you said or
5  something that your colleagues said or did it
6  vary from conversation to conversation.
7       A     They had told me and basically they
8  told me this, but I was fully aware.
9       Q     They told you what?
10      A     That he could not deny my
11 obligations.
12      Q     In what context?
13      A     You're losing me here.
14      Q     How did that subject come up, was it
15 something that you initiated was it something
16 that your colleagues initiated?
17      A     I had to go away for the weekend
18 once a month so it always came up.  It was
19 expressed of Kenny's displeasures that I had to
20 go away that weekend and I told him I had to do
21 this.  It was my ordered date to report to duty
22 for that weekend.
23      Q     Was this displeasure that was
24 communicated to you by your colleagues or was
25 this displeasure that Mr. Oppedisano allegedly

Page 61

1         M. Campbell
2   expressed during the course of conversation to
3   you personally?
4       A       A lot of time it came down through
5   the ranks. So the chain of command it went from
6   me up to the top and back down and at times he
7   told me himself.
8       Q       Told you what?
9       A       I have to get somebody to fulfill
10  your place for this weekend.
11      Q       Were you flexible with regard to the
12  weekend that you selected?
13      A       No, sir, I did not.
14      Q       When colleagues told you that
15  Mr. Oppedisano supposedly expressed displeasure
16  about the fact that you had some reserve
17  obligations be it a weekend or two weeks
18  training, what did they tell you, if anything, as
19  to how that displeasure was expressed?
20      A       I'm sorry, you're going to repeat
21  that. I wasn't focusing at that moment.
22      Q       You testified a short while ago that
23  on occasion a supervisor or a colleague of yours
24  would indicate to you that Mr. Oppedisano had
25  expressed displeasure to them about your reserve

Page 62

1         M. Campbell
2   obligation, whether it was a weekend or a two
3   week training period, did I get that right?
4       A    Yes, sir.
5       Q    What, if anything, did those
6   colleagues generally say as to the way in which
7   Mr. Oppedisano expressed that displeasure, was it
8   something that he said, was it an expression that
9   he made, was it something else?
10      A    I guess it was something Kenny must
11  have told them. He was pissed.
12      Q    Did they tell you what he said to
13  indicate that he was pissed?
14      A    I had heard on numerous occasions
15  that Kenny was very upset. The exact verbatim
16  words of the conversation I do not know. You
17  would have to ask them.
18      Q    That information came to you from
19  any one of a number of sources?
20      A    There were a few sources correct.
21           MS. CONLON: Can we take a break.
22           (Whereupon, a recess was taken at
23  11:29 a.m. and returned at 11:42 a.m.)
24      Q    Mr. Campbell with respect to your
25  weekend obligations, were you assigned to report

1                    M. Campbell
2        A      I couldn't attend that.
3        Q      Did you tell her why?
4        A      I was obligated to fulfill my
5   reservist order.
6        Q      What did she say in response?
7        A      I believe I recall she said, well,
8   the United States government is just going to
9   have to check with the Oppedisanos to see if you
10  could make it there.
11       Q      What did you say, if anything, in
12  response to that?
13       A      I tole her I had no choice and I
14  wouldn't attend it.
15       Q      What, if anything, did she say?
16       A      We'll just see about that and at the
17  time I believe this was in the little coffee shop
18  and Eric Guggenheim --
19              MS. COLON:  Is there a question
20       pending.
21       A      Sorry.
22       Q      What, if anything, did you say in
23  response to Ms. Inelli's remark to the effect
24  we'll just see about that?
25       A      I just said I couldn't attend.

UNITED STATES DISTRICT COURT
STATE OF CONNECTICUT
DISTRICT OF BRIDGEPORT

```
* * * * * * * * * * * * * *
MITCHELL CAMPBELL,              *
         PLAINTIFF,             *
                                *   CIVIL ACTION NO.
VS.                             *   303 CV-0246 (SRU)
                                *
MAIN ENTERPRISES, INC.,         *
         DEFENDANT.             *   OCTOBER 14, 2003
* * * * * * * * * * * * * *
```

Deposition of **SUSANNE IANELLO**, taken pursuant to the Federal Rules of Civil Procedure, at the law offices of Cummings & Lockwood, LLC, 700 State Street, New Haven, Connecticut, before Ann W. Friedman, Notary Public in and for the State of Connecticut, on Tuesday, October 14, 2003, commencing at 5:26 p.m.



Ann W. Friedman, License No. 91

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE              100 PEARL STREET, 14th FLOOR
MADISON, CT  06443           HARTFORD, CT  06103-4506
(203) 245-9583                  (800) 839-6867
            FAX:  (203) 245-2760

1   manager?
2       A.    Policies, procedures.  At this point, we
3   were trying to set up an infrastructure and job
4   descriptions and more formal office stuff.
5       Q.    Had you done that previously?
6       A.    Uh-huh.
7       Q.    In the credit union?
8       A.    Uh-huh.
9       Q.    You have to say yes or no.
10      A.    I'm sorry.  Yes.
11      Q.    And were you able to come up with more
12  formal procedures for Main Enterprises?
13      A.    Yes.
14      Q.    What type of procedures did you come up
15  with?
16      A.    It was more of an infrastructure, rather
17  than procedures; more of duties and responsibilities.
18  I'm not sure it was ever formally implemented by the
19  time I left.
20      Q.    Can you give me an example of those duties
21  and responsibilities?
22      A.    An operations manager is one.  An
23  infrastructure where there were project managers; there
24  were managers of departments that they would be
25  accountable and responsible for the staff under them.

```
1       Q.    And who would report to you?
2       A.    The girls in the office reported to me.
3       Q.    Did any of the shop supervisors report to
4    you?
5       A.    No.  They reported to their project
6    managers.
7       Q.    And project managers changed from job to
8    job; do you know?
9       A.    I really wasn't involved in that.
10      Q.    Were you involved in the hiring or firing
11   of individuals?
12      A.    Not on my own, no.
13      Q.    Let's go to Mitch Campbell.  You were in
14   charge of the inventories at Main Enterprises?
15      A.    I was not in charge of inventory, no.
16      Q.    Who was in charge of inventory?
17      A.    There was a tool crib manager who was in
18   charge of the inventory.
19      Q.    And what was that person's name?
20      A.    Dean.  I don't remember his last name.  By
21   the time I left -- actually, I'm sorry, I believe it
22   was a gentleman, Dean somebody.
23      Q.    What was your role in the inventory?
24      A.    What we were trying to do at year-end was
25   get an accurate accounting of the inventory for the
```

```
 1   computer system.
 2       Q.   Was it a new system?
 3       A.   It was not a new system, but it was
 4   never -- they never used the inventory-tracking feature
 5   of the system.
 6       Q.   When we're talking about an inventory, do
 7   you know what year we're talking about?
 8       A.   Any year.
 9       Q.   Well, you said that they had never used the
10   inventory-tracking function.
11       A.   That's correct.  So it was something new we
12   were implementing; one of these new procedures.
13       Q.   Do you know if it was in 1999 or 2000 or
14   2001?
15       A.   I don't remember.
16       Q.   Is there anything that would refresh your
17   recollection as to what year that was?
18       A.   It was the year I left.
19       Q.   And you don't remember the year that you
20   left?
21       A.   (Moves head from side to side.)  I'm sorry.
22   I don't mean to be stupid.  I just . . .
23       Q.   You're not being stupid.  That's okay.
24       A.   It seems like a lot of things happened in a
25   lot of years.
```

```
 1         Q.    Okay.  Tell me about a conversation that
 2   took place between you and Mitch Campbell about the
 3   inventory.
 4         A.    I don't remember any conversation with
 5   Mitch Campbell about the inventory.
 6         Q.    Do you remember any conversation with Eric
 7   Guggenheim about the inventory?
 8         A.    I would not have discussed -- I can't
 9   imagine I would have discussed with either one of them
10   inventory.  Again, we were setting up an
11   infrastructure, and it would have gone through a chain
12   of command.
13         Q.    And you don't remember any discussion about
14   the timing of the inventory?
15         A.    No.
16         Q.    And you don't ever remember saying anything
17   to the effect that, "We'll see if Mitch can go away to
18   his Reserves while there's an inventory pending here at
19   Main Enterprises"?
20         A.    That would never have happened.
21         Q.    What do you remember about -- or do you
22   remember anything about Mitch Campbell?
23         A.    Uh-huh.
24         Q.    What do you remember about him?
25         A.    Mitch used to be -- and, again, I don't
```