## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------------------------------- X
MITCHELL CAMPBELL,          :

                           :     DOCKET NO. 3:03CV0246(SRU)

             Plaintiff,     :

                           :

v.                          :

                           :

MAIN ENTERPRISES, INC.,     :

                           :     APRIL 14, 2004

             Defendant.    :
------------------------------------------------------- X

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION IN LIMINE

"The purpose of a motion in limine is to allow the trial court to rule in advance on the admissibility and relevance of certain forecasted evidence." Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 293 F. Supp. 2d 397, 407 (S.D.N.Y. 2003)(Citations omitted). Parties may not, however, "seek to employ their in limine motions as preemptive weapons with which they endeavor to strike in shotgun fashion at whole topics and sources of prospective evidence, out of context and before any specific objection against its proper backdrop is raised, that each side anticipates the other may contemplate introducing at some point during the course of the trial, or as dispositive means to fully obviate a trial altogether." TVT Records v. Island Def Jam Music Group, 250 F. Supp. 2d 341, 344 (S.D.N.Y. 2003). Yet this is precisely the tact plaintiff Mitchell Campbell ("plaintiff") attempts to employ.

"Thus, in the guise of addressing limited evidentiary issues, [plaintiff's] motions in limine would effectively serve as a form of advance trial of substantive portions of the case, or indeed as a substitute for the trial itself." Id. Plaintiff's obvious objective is to tilt the playing field by severely compromising the ability of defendant Main Enterprises, Inc. ("defendant" or

**ORAL ARGUMENT REQUESTED**

"Main Enterprises") to rebut plaintiff's claim that he was fired on account of his obligations as a reservist, in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301, et seq. Indeed, plaintiff's motion in limine is designed to virtually ensure his success at trial by emptying defendant's quiver, arrow by arrow, before the battle begins.

As demonstrated below, not only is evidence of plaintiff's use of alcohol on the job, his criminal conviction and incarceration, and the suspension of his driver's license relevant, it is fundamental to Main Enterprises' defense. The evidence in question is highly probative, and albeit prejudicial, is far from unduly prejudicial, as required to warrant exclusion.

## Argument

"Evidence is relevant if the testimony 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Perkins v. Origin Medsystems, Inc., 2004 WL 90034, at *3 (D. Conn. Jan. 14, 2004)(Underhill, J.)(Citations omitted). The evidence plaintiff seeks to exclude easily fits within this broad definition of relevancy. And, "[b]ecause virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*. The unfairness contemplated involves some adverse effect beyond tending to prove a fact or issue that justifies admission." Cosentino v. David M. Herzog, M.D., P.C., 203 F.3d 164, 174-74 (2d Cir. 2000)(Emphasis in original)(Citations omitted). No such extraneous adverse effect is cited by plaintiff.

### 1.    On-The-Job Alcohol Use

Plaintiff rests his demand for exclusion of evidence that he consumed alcoholic beverages during working hours on the self-serving, but erroneous, assertion that "none of the[] reasons

2

given for Plaintiff's termination involve alcohol consumption." (Pltf's Mem. at p. 6). Additionally, plaintiff avers that "Kenneth Oppedisano, Main Enterprises' owner, stated in his deposition that he had no *direct evidence* of Plaintiff's alcohol use at all." (Id.)(Emphasis added). Plaintiff's asseverations go to the weight and credibility of the evidence concerning his drinking on the job, not its admissibility.

First of all, one of the principal reasons cited by Mr. Oppedisano for the decision to terminate plaintiff's employment was several instances of job abandonment. (Oppedisano Dep. at pp. 54-60, 84). The evidence will show that plaintiff's periodic abandonment of the work site was, on certain occasions at least, directly linked to his use of alcohol during working hours. (Oppedisano Dep. at pp. 21-22). This certainly magnifies the severity of plaintiff's misconduct, making it all the more relevant to the ultimate issue of motivation.

Second, although Mr. Oppedisano denied having *direct evidence* that plaintiff consumed alcohol while on the clock, he did receive reports to that effect from subordinate managers. (Id.). Even if these reports were false, the fact they were made to Mr. Oppedisano, and he believed them, is sufficient to prove the legitimacy of defendant's motivation for the challenged discharge decision. Cameron v. Community Aid For Retarded Children, 335 F.3d 60, 65-66 (2d Cir. 2003)(plaintiff's allegation that colleague's reports about his lack of managerial skills and temperament were fabricated was not evidence of discriminatory motivation because "[t]he inaccuracy of those reports does not matter if [the decision-maker] believed them.")(Footnote and citations omitted).

Plaintiff can certainly attempt to impeach Mr. Oppedisano through cross-examination directed to any perceived discrepancy between his deposition and trial testimony as to the role plaintiff's alcohol consumption played in the discharge decision, but he cannot exclude the

evidence altogether as irrelevant or unduly prejudicial. "For purposes of admissibility it is not required that a witness's account of an event be consistent with the same witness's other accounts of the same event. A witness may say one thing on one occasion and because of human fallibility speak differently about the same event later. Which version is believed is for the jury, not the judge, to decide. The right of the jury to disbelieve an earlier version in favor of a later one, in whole or in part, does not by itself make the earlier version irrelevant." Girden v. Sandals International, 262 F.3d 195, 199 (2d Cir. 2001).

Exclusion of evidence concerning plaintiff's on-the-job alcohol use would be entirely inappropriate.

### 2.    **Incarceration**

Plaintiff attempts to hamstring defendant by seeking exclusion of vital evidence that he was incarcerated for approximately two (2) months during the summer of 2000.

A major component of Main Enterprises' defense will be a proffer showing multiple examples of Mr. Oppedisano's favorable treatment of plaintiff despite knowledge of his reserve obligations. Perhaps the most compelling piece of evidence in this regard is the undisputed fact that upon plaintiff's release from prison in August 2000, some two (2) years after plaintiff joined the Naval Reserves, defendant re-hired him, and almost immediately thereafter approved his request for a two-week leave of absence to attend reserve training. (Pltf's Dep. at pp. 104-05, 138-39; Oppedisano Dep. at pp. 48-50). Such evidence of favorable treatment is highly probative because it "contradicts an inference of discrimination. Here, an invidious motivation would be inconsistent with [Mr. Oppedisano's] earlier affinity towards Plaintiff." Atterberry v. IKON Office Solutions, Inc., 2003 WL 22937719, at *8 (D. Conn. Dec. 10, 2003)(Citation omitted).

Defendant would be severely, and unfairly, hampered in its ability to present its case to the jury if perfectly relevant evidence that plaintiff's employment was interrupted by a period of incarceration were to be excluded.

### 3.     Driver's License Suspension

The same evidentiary principles discussed immediately above serve to defeat that aspect of plaintiff's motion in limine seeking a gag order on testimony regarding the suspension of plaintiff's driver's license in 2000. Here, again, Mr. Oppedisano had the perfect opportunity to fire plaintiff but, despite full knowledge as to the scope of plaintiff's reserve obligations, he did not do so. Rather, Mr. Oppedisano reassigned plaintiff from the field -- a position that required driving to and from the worksite -- to a fabricator job in the shop -- a position that did not involve driving. (Pltf's Dep. at pp. 169-73). Exclusion of evidence so essential to Main Enterprises' defense would be unfair in the extreme.

**Conclusion**

For these reasons, plaintiff's motion in limine should be denied in its entirety.

Respectfully submitted,

THE DEFENDANT,
MAIN ENTERPRISES, INC.

Lawrence Peikes (ct 07913)
Wiggin and Dana LLP
Its Attorneys
400 Atlantic Street
P.O. Box 110325
Stamford, CT  06911-0325
(203) 363-7600
(203) 363-7676 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on April 15, 2004, I caused a copy of the foregoing Defendant's

Memorandum of Law in Opposition to Plaintiff's Motion in Limine to be served by first-class

U.S. mail, postage prepaid, on:

> Robert J. Sickinger, Esq.
> Cummings & Lockwood LLC
> 107 Elm Street
> Stamford, CT 06902

_____
Lawrence Peikes

\16130\1\85524.1

6

**EXHIBIT A**

COPY

1

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF CONNECTICUT

4  ------------------------------------------x

5  MITCHELL CAMPBELL,

6

7                              Plaintiff,

8           -against-        Civil Action No.

9                            3:03 CV 0246  (SRU)

10 MAIN ENTERPRISES, INC.,

11

12

13                              Defendant.

14 ------------------------------------------x

15                    October 23, 2003

16                    9:46 a.m.

17

18        Examination Before Trial of MITCHELL

19     CAMPBELL, taken by Defendant, pursuant to

20     court order, held at the offices of Wiggin

21     & Dana 400 Atlantic Street, Stamford,

22     Connecticut, New York, New York, before

23     Michele DiEdwards a Notary Public within

24     and for the State of New York.

25

```
 1                    M. Campbell
 2    classified as.  It was a much bigger prison it
 3    wasn't a local prison.
 4        Q      Was this the only occasion you were
 5    in jail?
 6        A      First time I've ever been in jail,
 7    sir.
 8        Q      Was it the last?
 9        A      Yes, sir.
10        Q      You indicated after your sentence
11    was imposed you had a conversation with Kenneth
12    Oppedisano where you advised him of the fact that
13    you were going to be gone for 90 days to report
14    to jail, correct?
15        A      Run that by me again.
16        Q      You had a conversation with
17    Mr. Oppedisano after you were sentenced where you
18    told him you were going to jail?
19        A      I told him before, after the
20    sentence, that was going away to jail.
21        Q      What was his reaction, what was his
22    response?
23        A      What was his reaction?  Again, he
24    expresses concern and that, let me see, I would
25    have a job when I got out.  That was one of my
```

1                      M. Campbell

2    concerns, would I still have a job when I got

3    out.

4          Q       He said you would?

5          A       He said I would still have a job.

6          Q       Do you recall anything else about

7    that conversation?

8          A       No, sir.

9          Q       Pardon me?

10         A       No, sir.

11         Q       Did you thank Mr. Oppedisano?

12         A       I believe I did thank him.

13         Q       Did you feel he was being supportive

14   at the time?

15         A       Yeah, he was supportive.

16         Q       Did he honor that commitment and

17   actually bring you back to work after your jail

18   sentence was done?

19         A       Yeah, he did.  I think I surprised

20   him when I showed up the first day I got back.

21         Q       Why do you think you surprised him?

22         A       He did not recognize me.

23         Q       Do you know why that is?

24         A       My hair was long and I had a beard.

25         Q       Had you lost weight?

Page 138

1                          M. Campbell

2          A        No.

3          Q        Who did you submit this form to?

4          A        To my immediate supervisor.

5          Q        At the time that was Mr. Guggenheim

6   or Mr. Cahn or someone else?

7          A        It looks to be Robert Cahn.

8          Q        Does this appear to be his signature

9   next to the first supervisor line?

10         A        Yes, sir.

11         Q        Mr. Oppedisano signature appears on

12   the second supervisor line?

13         A        Yes, sir.

14         Q        In both cases the supervisor has

15   check the approved box?

16         A        Yeah.

17         Q        Did you, in fact, take a leave

18   during the period of September 18, 2000 through

19   September 29th, 2000?

20         A        Yes, sir.

21         Q        Were you reinstated to your previous

22   job after taking that leave?

23         A        Yes.

24         Q        Did you receive a cut in pay after

25   you returned to work?

1                    M. Campbell

2        A       No, I did not.

3        Q       You returned at the same rate of

4   compensation; is that right?

5        A       Yes, sir.

6        Q       You returned with the same benefits;

7   is that right?

8        A       Yes, sir.

9        Q       Were you disciplined in any way for

10  taking a leave?

11       A       No, I was not.

12       Q       Did you have an explanation as to

13  why in 1999 you took your leave at the end of

14  June in early to mid-July whereas in 2000 you

15  took your leave in September?

16       A       I think the first time around as far

17  as I know, the '99 one, I wasn't fully aware

18  of -- I was new to my annual training.  I was not

19  aware that you could actually pretty much plan

20  for what time of year you want to take your

21  leave.

22       Q       So with respect to '99 you were just

23  given those dates by your commanding officer?

24       A       I was told that I had different time

25  frames and I had to pick one and he told me

1                        M. Campbell

2        A       I can't recall at that time.

3        Q       Is there some connection between the

4   suspension of your license and your assignment to

5   the shop?

6        A       Yes, there was.

7        Q       What is that connection?

8        A       I couldn't drive the company

9   vehicles to go to the job sites and so Kenny

10  assigned me to the shop.

11       Q       What was your responsibility at the

12  shop?

13       A       The manufacturing, fabrication of

14  the duct work to be installed on various jobs.

15       Q       How long were you in the shop for?

16       A       I was there several months.

17       Q       Do you recall when?

18       A       It was the winter, winter through

19  summer, right into August or September of '01.

20       Q       So it of would have been the last

21  part of 2000 and into 2001, is that your

22  recollection?

23       A       I'm just trying to remember all the

24  dates at this point.

25               MS. COLON:  This isn't going to

1                        M. Campbell

2          help.  I'm sorry.

3          A       I believe -- I'm not sure of the

4    dates.

5          Q       Just by way of a chronological

6    guidepost, after you returned from prison did you

7    go into a position out in the field or did you go

8    into a position in the shop at Main Enterprises?

9          A       I can't remember if I went directly

10   to the shop or if I was still assisting in the

11   field and still being chauffeured.  I believe it

12   might be directly to the shop.

13         Q       I believe you testified a little bit

14   earlier that you now have an active driver's

15   license?

16         A       That's correct.

17         Q       When did your license become active

18   again?

19         A       I could look at my driver's license.

20         Q       If you have it go ahead if that will

21   help.

22         A       It was December of 2001.

23         Q       Tell me if I get the sequence wrong

24   at all, but your license had been suspended at

25   one point and then your incarceration came about

Page 171

```
 1                      M. Campbell
 2   because of your driving with a suspended license;
 3   is that right?
 4        A        That's correct.
 5        Q        As part of your sentence or your
 6   penalty for driving with a suspended license, in
 7   addition to your incarceration was your license
 8   suspended for additional time?
 9        A        I believe there was six months
10   after.  Like I say I can't be specific on the
11   dates, I can't remember the dates anymore.
12        Q        When you were released from prison
13   the suspension of your license continued?
14        A        Which is why I was assigned to the
15   shop, correct.
16        Q        Had you ever worked at the shop
17   before at Main Enterprises?
18        A        Yes, sir.
19        Q        When was that?
20        A        Throughout my entire employment.  In
21   the beginning I was assigned specifically to the
22   shop for a short period.  Predominantly I was a
23   field man.  I have shop experience, for that
24   matter I was able to make various fittings and
25   transitions and everything else.
```

1                    M. Campbell

2          Q      On a continual basis you might be

3    assigned to the work in the shop?

4          A      Yes, sir.

5          Q      You were assigned there until 2001,

6    that's where you went every day to work?

7          A      Yes, sir.

8          Q      You were reporting to Mr. Guggenheim

9    at that point in time, correct?

10         A      That's correct.

11         Q      At some point did you go back out in

12   the field?

13         A      Yes, I did.

14         Q      When was that?

15         A      The summer of 2001.

16         Q      What job or jobs were you assigned

17   to?

18         A      There was a job next door to the

19   shop that I could walk to.

20         Q      Was that with Court Furniture?

21         A      That's the job, yes, sir.

22         Q      How long were you on that job?

23         A      It was on and off.  It went through

24   so many different mechanics.

25         Q      How long were you assigned to that

1                      M. Campbell

2    job for?

3         A      Like I said, there was a period of

4    weeks and the next thing it was on to another

5    mechanic.  There was so many mechanics on that

6    job.  I don't know the exact length of time I was

7    on it.

8         Q      When you went on that job on a given

9    day were you working in the shop?

10        A      At times.

11        Q      Where else would you have been

12   working?

13        A      Between the two jobs, if I wasn't on

14   the job I would have been in the shop.

15        Q      Did you have anybody working for you

16   on that job?

17        A      A couple of people, yes.

18        Q      Who were they?

19        A      I'm just trying to remember, there

20   was a Juan Pabon who was there, P-A-B-O-N.  I

21   think Eric Guggenheim was there a couple of times

22   and once or twice people might have came in for

23   fill-in work if other jobs might have ended up

24   being done earlier and they use that job for

25   fill-in time.

**EXHIBIT B**

UNITED STATES DISTRICT COURT
STATE OF CONNECTICUT
DISTRICT OF BRIDGEPORT

\* \* \* \* \* \* \* \* \* \* \* \* \* \*
MITCHELL CAMPBELL,                  \*
                    PLAINTIFF,      \*
                                    \*    CIVIL ACTION NO.
VS.                                 \*    303 CV-0246 (SRU)
                                    \*
MAIN ENTERPRISES, INC.,             \*
                    DEFENDANT.      \*    SEPTEMBER 24, 2003
\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of **KENNETH OPPEDISANO**, taken

pursuant to the Federal Rules of Civil Procedure, at

the law offices of Cummings & Lockwood, LLC, 700 State

Street, New Haven, Connecticut, before Ann W. Friedman,

Notary Public in and for the State of Connecticut, on

Wednesday, September 24, 2003, commencing at 10:19 a.m.

# COPY

Ann W. Friedman, License No. 91

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE          100 PEARL STREET, 14th FLOOR
MADISON, CT   06443      HARTFORD, CT   06103-4506
(203) 245-9583              (800) 839-6867
          FAX:   (203) 245-2760

```
 1                    What was "that"?

 2                         MS. CONLON:  When an employee would

 3                    have a written grievance to an immediate

 4                    supervisor about the behavior of another

 5                    employee.

 6         A.    I don't remember that happening.

 7    BY MS. CONLON:

 8         Q.    Do you remember any instances when an

 9    employee would go to a supervisor who would then go to

10    you about an employee who was doing drugs or drinking

11    on the job?

12         A.    Yes.

13         Q.    When?

14         A.    During Mitch's employment.

15         Q.    When during Mitch's employment?

16         A.    During the FSW project.

17         Q.    What's the FSW project?

18         A.    Family Services of Woodfield.

19         Q.    Who spoke to whom?

20         A.    I had gotten that information from, I

21    believe it was, Bob Cahn - C-a-h-n.

22         Q.    And who did Mr. Cahn get the information

23    from?

24         A.    I don't know.

25         Q.    Did you have a face-to-face conversation
```

DEL VECCHIO REPORTING SERVICES, LLC

1    with Mr. Cahn?

2         A.    I did.

3         Q.    Do you remember where the conversation took

4    place?

5         A.    I do not.

6         Q.    Do you remember if it was in the field or

7    in the office?

8         A.    It was in the office or the shop.

9         Q.    What did Mr. Cahn say to you?

10        A.    He felt that Mitch was abusing alcohol

11   during working hours.

12        Q.    And what did you say to him?

13        A.    I said, "Can you prove it?"

14        Q.    And, then, what did he say?

15        A.    He said, "No."

16        Q.    And what did you say?

17        A.    I said, "There's nothing we can do."

18        Q.    At any time during that FSW project, did

19   you come to learn that Mitch was abusing -- did you get

20   evidence that he was abusing alcohol on the job?

21              MR. PEIKES:  Objection to the form of

22              the question.

23        A.    During FSW?

24   BY MS. CONLON:

25        Q.    Yes.

1          A.     His incarceration, his leaving and

2     abandoning the job.

3          Q.     Abandoning which job?

4          A.     The only ones I'm aware of.  There are two

5     that I am aware of:  Family Services of Woodfield and

6     Cort Furniture.

7          Q.     Okay.

8          A.     The stealing of merchandise, materials of

9     our ownership, and the unauthorized removal of

10    materials from others' sites.

11         Q.     Why do you believe his incarceration

12    adversely impacted his employment?

13         A.     It was unexpected and conflicted with our

14    work schedule, and we just didn't realize that there

15    was that type of a problem.

16         Q.     After he was incarcerated, did you hire him

17    back?

18         A.     Yes.

19         Q.     Why did you hire him back?

20         A.     I am -- the way I carry myself is to try to

21    work with people the best I can to give the person as

22    much ability to succeed as possible.  I thought Mitch

23    had potential to succeed and overcome that instance, so

24    I gave him that opportunity to come back.

25         Q.     What did he do when he came back in terms

```
 1    of job responsibilities?

 2         A.    I think it was like the same as when he

 3    left.  I believe it was in the shop as well as in the

 4    field.

 5         Q.    How did you find out that he was going to

 6    be incarcerated?

 7         A.    He told me before he was going to go.

 8         Q.    Do you remember the conversation?

 9         A.    Vaguely.

10         Q.    Do you remember where the conversation took

11    place?

12         A.    I believe in my office.

13         Q.    What's your recollection of the

14    conversation?

15         A.    That Mitch told me he had some bad news,

16    that he had to go away for a period of time, and that

17    he would like to request the time off and that he would

18    like to have his job back when it was over.

19         Q.    Did he explain to you where he was going?

20         A.    He told me, after a while, that he was

21    going to have to go to jail.

22         Q.    Do you remember what you said back to him?

23         A.    I expressed my concern for him and his

24    family, and I asked if there was anything that I could

25    do, and that's when he asked if he could have his job
```

```
 1   back when he was finished with his time.

 2        Q.    And you agreed to that?

 3        A.    I did.

 4        Q.    What was his work like when he got back?

 5        A.    Fair to good.

 6        Q.    Do you remember when he got back?

 7        A.    Three months after he left.

 8        Q.    Do you remember --

 9        A.    I do not.  I'm sorry.  Go ahead.  You

10   didn't finish your question.

11        Q.    Do you remember what month he left?

12        A.    I don't.

13        Q.    Do you remember if it was in the summer?

14        A.    I don't remember.

15        Q.    Do you think your payroll records would

16   help you remember when that was?  Would he have stopped

17   receiving a paycheck during that three-month period?

18        A.    Yes.

19        Q.    Do you remember what jobs he was on when he

20   came back?

21        A.    I don't.

22        Q.    Who were his supervisors when he came back?

23        A.    Gary and myself.

24        Q.    Was Robert Cahn one of his supervisors when

25   he came back?
```

1        Q.      When?

2        A.      During the Family Services project.

3        Q.      When was that?

4        A.      I don't know that date.

5        Q.      Are there any records that you might have

6    that would help you remember when that project was?

7        A.      Yes.

8        Q.      Where would those be located?

9        A.      In our office.

10        Q.      Do you remember if that Family Services

11    project was a long-duration project; over a year?

12        A.      It was not over a year, no.

13        Q.      Do you know how long it was?

14        A.      From start to finish, probably about four

15    months.

16        Q.      What did you do in that project?

17        A.      We installed heating and air conditioning

18    systems.

19        Q.      Do you know what Mitch's role was in that?

20        A.      Field foreman.

21        Q.      Do you know how many people worked on that

22    project with him?

23        A.      Probably six to eight people total, which

24    fluctuated.

25        Q.      And was that where he was supposed to be

55

1     every day working during that four-month period?

2          A.    It would vary.

3          Q.    What was your conversation with Bob Cahn

4     about this?

5          A.    Bob commented that the job wasn't getting

6     done on time.

7          Q.    Did he say why?

8          A.    He felt that Mitch's being on the job was

9     not -- Mitch wasn't on the job all the time, leaving

10    his people unattended.

11         Q.    And how did he know that Mitch wasn't on

12    the job?

13         A.    His job is to check the jobs from time to

14    time, to visit the sites.

15         Q.    Did he tell you how often Mitch wasn't on

16    the job?

17         A.    No.

18         Q.    Do you have an understanding of how often

19    Mitch wasn't on the job?

20         A.    No.

21         Q.    You heard testimony yesterday, I believe,

22    that there was a -- that Mr. Campbell testified that he

23    was gone -- he had one long lunch, longer than the

24    half-hour allotted.  Do you know if he was gone more

25    than that?

1       A.      Yes, I do.

2       Q.      How do you know that?

3       A.      Bob Cahn told me, as well as other people

4  on the jobsite he was working with told me.

5       Q.      What did Bob Cahn tell you?

6       A.      He told me that Mitch was continuously

7  absent from the job.

8       Q.      Do you have any idea of how many days he

9  was absent from the job?

10      A.      No.

11      Q.      What other people on the job had told you

12  that he was absent from the job?

13      A.      Jim Hunter.

14      Q.      When did Jim Hunter talk to you about this?

15      A.      About a month ago.

16      Q.      What did he say?

17      A.      He said to me that Mitch was not on the

18  Family Services job and it created a big hardship for

19  him as well as the company.

20      Q.      Did he say anything else?

21      A.      Not that I know of.

22      Q.      When he said he wasn't on the Family

23  Services job, did he mean that he wasn't there

24  physically doing the work?

25                      MR. PEIKES:   Objection to the form.

1    BY MS. CONLON:

2        Q.    If you know.

3        A.    Yes.

4        Q.    Did he say how many days he wasn't on the

5    job?

6        A.    No.

7        Q.    Has anybody determined how many days he

8    wasn't on the job?

9        A.    No.

10        Q.    Did you have any conversations with anyone

11    else who was on that jobsite about Mitch's absences,

12    other than Bob Cahn and Jim Hunter?

13        A.    The project manager for the customer.

14        Q.    Who was that?

15        A.    I don't remember his name.  It might have

16    been Skip, but I'm assuming.

17        Q.    Okay.  And Skip worked for Family Services

18    of Woodfield?

19        A.    No.

20        Q.    Who did he work for?

21        A.    Kuchma Construction.

22        Q.    Could you spell that, please?

23        A.    K-u-c-h-m-a.

24        Q.    When did you have a conversation with that

25    individual?

DEL VECCHIO REPORTING SERVICES, LLC

1       A.      During the FSW project.

2       Q.      What did he say to you?

3       A.      Basically that, "Your men are not on the

4    job, they're not given the proper guidance, and they're

5    falling behind," and "Workmanship is shoddy."

6       Q.      Did you go out and check the site?

7       A.      I did.

8       Q.      When did you do that?

9       A.      The day I got the call.

10      Q.      Do you remember the date of the call?

11      A.      I do not.

12      Q.      You went out to the site?

13      A.      I did.

14      Q.      What did you do when you got there?

15      A.      Walked the site.

16      Q.      And what did you find?

17      A.      I found that the work was below our

18   standard of quality.

19      Q.      How so?

20      A.      In that things were not as level and plumb

21   as I would like them, as they should be.  The overall

22   work product and workplace was messy.

23      Q.      What do you mean by "messy"?

24      A.      Unorganized and the worksite was untidy.

25      Q.      What else did you find?

DEL VECCHIO REPORTING SERVICES, LLC

1     A.    That the work wasn't as far along as I

2  expected it to be.

3     Q.    Did you go with anyone?

4     A.    I did not.

5     Q.    Was anyone there when you went?

6     A.    It was lunchtime.

7     Q.    What did you do as a result of your

8  inspection?

9     A.    Had a conversation with Mitch in my office;

10  I don't know whether it was the next day or closely

11  thereafter.  And I basically -- at that time, I excused

12  him from the employment of Main Enterprises.

13     Q.    What do you mean you excused him from the

14  employment of Main Enterprises?

15     A.    I said that this was his last day based on

16  the work at the FSW project.

17     Q.    And then what happened?

18     A.    Mitch started to explain that he would like

19  to have another chance, he couldn't believe after all

20  these years that I was going to fire him, and if I

21  could reconsider.

22     Q.    Did you talk to anybody else in the company

23  about excusing him from Main Enterprises that day?

24     A.    No.

25     Q.    Did you have a pink slip drawn up for him?

1        A.    Not at that time.

2        Q.    Is there any documentation that you fired

3    him that day or that you were excusing him from

4    Main Enterprises that day?

5        A.    No.

6        Q.    You didn't talk to Linda Polito and tell

7    her to stop the payroll that day?

8        A.    (Moves head from side to side.)

9        Q.    Was Susan Ianello employed by you at that

10    time?

11        A.    I don't think so.

12        Q.    Okay.  And you talked to no one else at the

13    company about it?

14        A.    No.

15        Q.    Then what happened?

16        A.    After further discussion with Mitch, at

17    that same meeting in that same office, I agreed to keep

18    him on conditionally that things would change.

19        Q.    And what things would change?

20        A.    In the area of his quality of work and his

21    absenteeism from the job.  And he assured me it would.

22        Q.    Earlier you said that you learned about

23    Mitch's absenteeism from Jim Hunter about a month ago.

24    Is there anyone other than Bob Cahn who would have

25    information about Mitch's alleged absenteeism from the

```
 1          A.    No.

 2          Q.    Did you talk to Pat Rause about it?

 3          A.    I don't believe so.

 4          Q.    Why did you terminate him?

 5          A.    For several reasons.

 6          Q.    And those reasons are?

 7          A.    Shoddy workmanship; abandoning a job,

 8    plural.

 9          Q.    Abandoning jobs?

10          A.    (Moves head up and down.)  And taking

11    materials from our facility.

12          Q.    Okay.  We'll go there now.  I think --

13          A.    Would you like me to continue?

14          Q.    Sure.

15          A.    And taking materials from others'

16    facilities.  And that's it.

17          Q.    What materials were taken from your

18    facility?

19          A.    There was a bench that we had purchased --

20    a table, a workbench that we had purchased that was in

21    our possession, in our facility, that was not there one

22    day when I went to go get it.  So it was a bench.

23          Q.    And how do you know that Mitch took it?

24          A.    Because I inquired.

25          Q.    From whom?
```