**EXHIBIT B**

UNITED STATES DISTRICT COURT
STATE OF CONNECTICUT
DISTRICT OF BRIDGEPORT

```
* * * * * * * * * * * * * *
MITCHELL CAMPBELL,              *
          PLAINTIFF,           *
                               *   CIVIL ACTION NO.
VS.                            *   303 CV-0246 (SRU)
                               *
MAIN ENTERPRISES, INC.,        *
          DEFENDANT.           *   SEPTEMBER 24, 2003
* * * * * * * * * * * * * *
```

Deposition of **KENNETH OPPEDISANO**, taken

pursuant to the Federal Rules of Civil Procedure, at

the law offices of Cummings & Lockwood, LLC, 700 State

Street, New Haven, Connecticut, before Ann W. Friedman,

Notary Public in and for the State of Connecticut, on

Wednesday, September 24, 2003, commencing at 10:19 a.m.

# COPY

Ann W. Friedman, License No. 91

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE              100 PEARL STREET, 14th FLOOR
MADISON, CT   06443          HARTFORD, CT   06103-4506
(203) 245-9583                 (800) 839-6867
          FAX:   (203) 245-2760

```
1         A.    I do not.

2         Q.    In 1995, who was in Mitch's chain of

3    command?  Who would he report to?

4         A.    Several people.

5         Q.    Who?

6         A.    Myself, Gary.  In '95, I believe that was

7    it.

8         Q.    So if he in '95 had a leave request, who

9    would it go to first?

10        A.    Gary.

11        Q.    And then who would it go to?

12        A.    Me.

13        Q.    Did there come a time when more people were

14   added to the chain of command?

15        A.    Yes.

16        Q.    When was that?

17        A.    Throughout that period to 2000.

18        Q.    Who was added?

19        A.    Several people.

20        Q.    Who?

21        A.    Linda.

22        Q.    Linda Polito?

23        A.    Uh-huh.

24        Q.    Who else?

25        A.    Bob Cahn.
```

```
 1          Q.    Who else?

 2          A.    Richard Guggenheim.

 3          Q.    Anybody else?

 4          A.    I don't believe so.

 5          Q.    What did Linda Polito do?

 6          A.    With?

 7          Q.    At Main Enterprises.

 8          A.    Oh.  She's secretary.

 9          Q.    Secretary to whom?

10          A.    Everybody in the office.

11          Q.    How did she become one of Mitch Campbell's

12   supervisors?

13          A.    She never was.

14          Q.    I'm a little confused, but that's nothing

15   new.  I thought I asked you previously if there were

16   other people added to Mitch Campbell's chain of

17   command, who he would report to, and you said Linda

18   Polito was one of those people.  What would he report

19   to her about if she wasn't his supervisor?

20          A.    I think the question prior to that was who

21   would Mitch Campbell submit a request for vacation to,

22   and then you said who would he -- what was the chain of

23   command.  That's my recollection.

24          Q.    That's okay.

25          A.    And in answer to your question what Linda
```

DEL VECCHIO REPORTING SERVICES, LLC

1    would be responding to in the way of Mitch's request

2    for vacation, it would be the payroll side of things;

3    to post it to payroll and to make sure that he has

4    vacation time or not.  So I guess what I'm saying is

5    that's how Linda gets into the mix.  If that's not what

6    you intended the question to be, I apologize.

7        Q.    That's okay.  So she was never in a

8    supervisory role for Mitch Campbell?

9        A.    No.

10        Q.    Bob Cahn was in a supervisory role?

11        A.    Yes.

12        Q.    What was Mr. Cahn's position?

13        A.    He was a shop foreman at one time and then

14    a project manager after that.

15        Q.    What does a shop foreman do at Main

16    Enterprises?

17        A.    He's pretty much in charge of the shop in

18    the way of production and making sure the quality of

19    the production is kept at a high standard.

20        Q.    What does a project manager do?

21        A.    The same type of work but on an overall

22    project level.

23        Q.    How many projects do you have going at one

24    time now?

25        A.    Twenty-five.

1      Q.    What did you do when you left?

2      A.    Walked back.

3      Q.    Then what happened?

4      A.    I can't remember.

5      Q.    Did you call Mitch into your office?

6      A.    Mitch was not at work.

7      Q.    At any time following that, did you call

8  Mitch into your office?

9      A.    No.

10     Q.    What did you do as it relates to

11  Mr. Campbell following that?

12     A.    At that point in time?

13     Q.    Uh-huh.

14     A.    I didn't take any action on that day.

15     Q.    When did you take action?

16     A.    On his termination.

17     Q.    When was that?

18     A.    In August.

19     Q.    Did you talk to anybody about the fact that

20  you had gone to the jobsite and no one was there?

21     A.    No.

22     Q.    Did you talk to -- who made the decision to

23  terminate Mr. Campbell?

24     A.    I did.

25     Q.    When did you make that decision?

1          A.     In August.

2          Q.     How close was it to the time that you had

3    come back from the jobsite and saw he wasn't there?

4          A.     Very.

5          Q.     When you say "very," what do you mean?

6          A.     Within a week.

7          Q.     Did you talk to anybody about that

8    decision?

9          A.     I did not.

10         Q.     Did you fire him personally?

11         A.     No.

12         Q.     Okay.  Who did you talk to to fire him?

13         A.     Sue Ianello.

14         Q.     When did you talk to her?

15         A.     I can't remember.

16         Q.     What did you say to her?

17         A.     That, "We've got to let Mitch go."

18         Q.     And what did she say to you?

19         A.     "Okay."

20         Q.     Did she ask for reasons why?

21         A.     No.

22         Q.     Did you give her any reasons why?

23         A.     I might have told her because of the

24   workmanship at Cort Furniture.

25         Q.     Did you talk to anyone else about it?

```
 1        Q.    Would she check it with you first?

 2        A.    Not necessarily.

 3        Q.    Okay.  Do you know what, if anything,

 4   happened when Mitch Campbell told Sue Ianello that he

 5   couldn't do the inventory because he would be going

 6   Reserves?

 7        A.    I don't know.

 8                  MR. PEIKES:  Objection to the form.

 9   BY MS. CONLON:

10        Q.    I'm sorry?

11                  MR. PEIKES:  Go ahead.

12        A.    I don't know if anything had taken place.

13   BY MS. CONLON:

14        Q.    Okay.  Had she talked to you about Mitch's

15   inability to perform in the inventory?

16        A.    No.

17        Q.    Did she tell you about any of the

18   discussions that they had regarding that inventory?

19        A.    That's not my place.  I wasn't in that

20   picture.

21        Q.    You weren't involved in any of those

22   discussions at all?

23        A.    No.

24                  MS. CONLON:  Could you mark that,

25            please?
```

1                     (Plaintiff's Exhibit E,

2                         request for time off, marked.)

3    BY MS. CONLON:

4         Q.    I'm going to show you what we've marked as

5    Exhibit E.   What is that, if you know?

6         A.    What's what?

7         Q.    What is that document?

8         A.    This particular document here (indicating)?

9         Q.    Uh-huh.

10        A.    This is our normal request that an employee

11   would turn in to request time off.

12        Q.    Is there any policy and procedure as to how

13   far from the request an employee has to submit it to

14   the company?

15                     MR. PEIKES:  Objection to the form.

16        A.    There's no written policy or procedure for

17   that.

18   BY MS. CONLON:

19        Q.    Is there a general rule of thumb?

20        A.    Yes.

21        Q.    What is it?

22        A.    As soon as they know.

23        Q.    If you could just take a look at that,

24   could you tell me what the initial request is for?

25        A.    It looks like a cruise, requesting a

1    Caribbean cruise.

2            Q.    And is it for Mitch Campbell?

3            A.    It says "Campbell" at the end of it.

4            Q.    What would have been the usual procedure

5    for this request to go through the channels?  Who would

6    it have gone to for Mitch Campbell at this time?

7            A.    He would give it to his supervisor and that

8    supervisor would give it to me.

9            Q.    Do you know who the supervisor was at that

10   time?

11           A.    I'm assuming it's Bob Cahn.

12           Q.    Why are you assuming that?

13           A.    It looks to be his signature at the bottom

14   of this.

15           Q.    Would you recognize Mr. Cahn's signature if

16   you saw it?

17           A.    Yeah.

18           Q.    Is that Mr. Cahn's signature?

19           A.    Hard to say.

20           Q.    Why?

21           A.    I haven't seen it in a while.

22           Q.    Do you have any reason to believe that

23   that's a forged signature of Mr. Cahn?

24           A.    I have no reason to believe that

25   whatsoever.

1    Q.    Attached to that note is what appears to be

2    a yellow sticky.  It could be a blue sticky, it could

3    be a pink sticky, because it's a Xerox copy, but it's

4    sticky nonetheless, or a Post-It note.  Do you

5    recognize that handwriting?

6    A.    I do.

7    Q.    And whose handwriting is that?

8    A.    That is my mine.

9    Q.    Could you read that into the record for us,

10    please?

11    A.    It says, "Not approved if he is taking" --

12    I'm sorry.  I'll do that over.  "Not approved if he is

13    also taking two weeks for the Reserves."

14    Q.    And is it signed by someone?

15    A.    "K.O."

16    Q.    And who is "K.O."?

17    A.    That's mine.

18    Q.    Why did you do that?

19    A.    Why did I do what?

20    Q.    Why did you write that sticky?

21    A.    At the time that this request for vacation

22    was given to me, Mr. Campbell had not yet given me his

23    obligation for the Reserves.

24    Q.    Okay.  When did he usually give it to you?

25    A.    A couple of weeks before he was leaving.

1        Q.    I'm sorry I interrupted you.  I apologize.

2        A.    That's okay.

3        Q.    Go ahead.

4        A.    He had not yet given me his obligation to

5    the Reserves when this came across my desk for my

6    approval.  I was concerned that his Reserve duty might

7    be linear or close to linear with his vacation request.

8    So until I had gotten his Reserve obligation, I

9    couldn't approve this.  That's why the note says, "Not

10   approved if he is also taking his two weeks' Reserves."

11       Q.    But the note doesn't say, "Not approved if

12   he is also taking two weeks for Reserves linearly to

13   this vacation."  It doesn't say that.

14              MR. PEIKES:  Objection to the form.

15       A.    Didn't need to.  In fact, she could have

16   just put, "Denied."

17   BY MS. CONLON:

18       Q.    Do you recall talking to anybody about this

19   request for leave?

20       A.    When?

21       Q.    At the time that it -- near the time that

22   it was submitted to you.

23       A.    No.

24       Q.    Did you talk to Bob Cahn about it at all?

25       A.    I believe I gave it back to him.

96

1       Q.   And did he say anything to you about the

2  sticky that you put on it?

3       A.   I don't remember.

4       Q.   At any point in time, did you have any

5  conversations, other than with your counsel, about this

6  note?

7       A.   With?

8       Q.   With anyone.

9       A.   No.

10      Q.   Did anyone tell you that you couldn't

11  disapprove of a vacation because of someone's Reserve

12  duty?

13      A.   I'm sorry?

14      Q.   Did anyone ever tell you that whether or

15  not someone went on Reserve duty had no impact on

16  whether or not they took vacation time?

17      A.   No.

18      Q.   Did you ever talk to anybody about dealing

19  with employees who were in the Reserves and what you

20  could and couldn't do as an employer?

21      A.   When?

22      Q.   Prior to this lawsuit.

23      A.   I knew the laws.

24      Q.   Okay.  And how did you know the laws?

25      A.   I just know that the obligation of a

1    Reservist, or any sort of military activity, has got to

2    be granted from an employer.

3         Q.    And how did you know that?

4         A.    It's just common knowledge, I guess.

5         Q.    All right.  In your answer and special

6    defenses to the Complaint that we filed against you,

7    you make a claim that, "Mr. Campbell has failed to

8    exhaust his available administrative remedies."  Do you

9    have any facts to support that statement?

10                   MR. PEIKES:  Objection to the form, to

11                   the extent it calls for any sort of legal

12                   conclusion.

13        A.    "Administrative remedies," I would assume,

14   means to seek further employment.

15   BY MS. CONLON:

16        Q.    Is that what you think that this means?

17                   MR. PEIKES:  Same objection.

18        A.    I'm not sure.

19   BY MS. CONLON:

20        Q.    Okay.  You also make a claim that, "The

21   plaintiff has failed to satisfy all statutory

22   prerequisites to the suit."  Do you have any factual

23   basis for making that special defense?

24                   MR. PEIKES:  Objection to the form, to

25                   the extent it calls for a legal conclusion.

# EXHIBIT C

UNITED STATES DISTRICT COURT
STATE OF CONNECTICUT
DISTRICT OF BRIDGEPORT

```
* * * * * * * * * * * * * *
MITCHELL CAMPBELL,              *
            PLAINTIFF,         *
                              *    CIVIL ACTION NO.
VS.                           *    303 CV-0246 (SRU)
                              *
MAIN ENTERPRISES, INC.,       *
            DEFENDANT.        *    OCTOBER 14, 2003
* * * * * * * * * * * * * *
```

Deposition of **SUSANNE IANELLO**, taken pursuant

to the Federal Rules of Civil Procedure, at the law

offices of Cummings & Lockwood, LLC, 700 State Street,

New Haven, Connecticut, before Ann W. Friedman, Notary

Public in and for the State of Connecticut, on Tuesday,

October 14, 2003, commencing at 5:26 p.m.



Ann W. Friedman, License No. 91

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE          100 PEARL STREET, 14th FLOOR
MADISON, CT  06443       HARTFORD, CT  06103-4506
(203) 245-9583             (800) 839-6867
            FAX:  (203) 245-2760

1    manager?

2          A.    Policies, procedures.  At this point, we

3    were trying to set up an infrastructure and job

4    descriptions and more formal office stuff.

5          Q.    Had you done that previously?

6          A.    Uh-huh.

7          Q.    In the credit union?

8          A.    Uh-huh.

9          Q.    You have to say yes or no.

10         A.    I'm sorry.  Yes.

11         Q.    And were you able to come up with more

12   formal procedures for Main Enterprises?

13         A.    Yes.

14         Q.    What type of procedures did you come up

15   with?

16         A.    It was more of an infrastructure, rather

17   than procedures; more of duties and responsibilities.

18   I'm not sure it was ever formally implemented by the

19   time I left.

20         Q.    Can you give me an example of those duties

21   and responsibilities?

22         A.    An operations manager is one.  An

23   infrastructure where there were project managers; there

24   were managers of departments that they would be

25   accountable and responsible for the staff under them.

1    Q.    And who would report to you?

2    A.    The girls in the office reported to me.

3    Q.    Did any of the shop supervisors report to

4    you?

5    A.    No.  They reported to their project

6    managers.

7    Q.    And project managers changed from job to

8    job; do you know?

9    A.    I really wasn't involved in that.

10    Q.    Were you involved in the hiring or firing

11    of individuals?

12    A.    Not on my own, no.

13    Q.    Let's go to Mitch Campbell.  You were in

14    charge of the inventories at Main Enterprises?

15    A.    I was not in charge of inventory, no.

16    Q.    Who was in charge of inventory?

17    A.    There was a tool crib manager who was in

18    charge of the inventory.

19    Q.    And what was that person's name?

20    A.    Dean.  I don't remember his last name.  By

21    the time I left -- actually, I'm sorry, I believe it

22    was a gentleman, Dean somebody.

23    Q.    What was your role in the inventory?

24    A.    What we were trying to do at year-end was

25    get an accurate accounting of the inventory for the

1      A.    Not much.

2      Q.    Did you talk to anybody about his

3  incarceration?

4      A.    No.

5      Q.    You never talked to anybody about what

6  would happen with his benefits or if he would be

7  reemployed?

8      A.    No.

9      Q.    Do you know who the shop supervisor was in

10  2000?

11      A.    Dick Guggenheim.

12      Q.    Do you know when Pat Rause left?

13      A.    No.

14      Q.    Did he leave after you?

15      A.    Yes.

16      Q.    Do you know anything about Mr. Oppedisano

17  excusing Mitch from work following -- I mean during the

18  Family Services of Woodfield project?

19      A.    I'm saying, yes, I know when Mitch was

20  dismissed; I'm not a hundred percent sure of the

21  contractor's name.

22      Q.    When you say "Yes," you know when Mitch was

23  dismissed, when was that?

24      A.    I don't know the date.

25      Q.    When you say "when Mitch was dismissed," do

1    you mean when you gave him a pink slip?

2          A.    Yes.

3          Q.    I'm talking about a time prior to that.    Do

4    you have any knowledge of Mr. Oppedisano firing Mitch

5    prior to that?

6          A.    No.

7          Q.    Can you tell me the events that led to

8    Mitch Campbell's firing from your point of view?

9          A.    Mitch was let out of the shop onto a job

10   that was within walking distance of our shop and Kenny

11   had gone out to the jobsite to check on it and see how

12   things were going, and the GC or foreman of the job was

13   outraged because the job was going bad, Mitch wasn't on

14   the job when he was supposed to be on the job, and

15   there were a lot of problems with the job.    The work

16   was sloppy and not done to the quality Ken thought it

17   should be.

18         Q.    And that was information that you got from

19   Mr. Oppedisano?

20         A.    That's correct.

21         Q.    Did you ever speak to that GC personally?

22         A.    No.

23         Q.    Then what happened?

24         A.    And Ken said, "That's it.    We've given him

25   enough leeway.    I can't take it."    At this point,

DEL VECCHIO REPORTING SERVICES, LLC

1    again, we were trying to set up an infrastructure and

2    we were trying to build the business to be able to take

3    larger jobs, and, to do that, we had to have good

4    quality employees.  And he said, "That's it.  I

5    can't -- we can't take it anymore.  He wasn't on the

6    job," blah, blah, blah, "I want him fired."

7         Q.    And where did he have that conversation

8    with you?

9         A.    In my office.

10        Q.    Do you remember when he had that

11   conversation with you?

12        A.    The exact date, no.

13        Q.    Was anybody else in your office with you

14   when you had that conversation?

15        A.    I don't remember.

16        Q.    When you say you don't remember the exact

17   date, do you remember around the time that this

18   discussion took place?

19        A.    I really don't remember.

20        Q.    Then what happened?

21        A.    So Ken said, "I want you to fire him."  So

22   I called Mitch up to my office with his supervisor.

23        Q.    Who was his supervisor?

24        A.    Dick Guggenheim.  And Ernie was present,

25   and we told Mitch that he wasn't on the job, and, you

1    know, it's not the first time this has happened and

2    Ken's had enough and he's fired.

3         Q.    And then what happened?

4         A.    I don't remember the exact details.

5         Q.    Was he upset?

6         A.    Yes.

7         Q.    Do you remember what he said, if anything,

8    to you?

9         A.    I really don't remember the exact details.

10        Q.    Do you remember if Dick Guggenheim said

11   anything?

12        A.    I don't remember.

13        Q.    How about if Ernie Prezioso said anything?

14        A.    I really don't remember the conversation.

15        Q.    Now, why would Mr. Prezioso be in that

16   meeting with Mitch?

17        A.    He was Ken's righthand man.  The way it was

18   kind of forming was Ernie and I were both his righthand

19   men.  Ernie handled the guys and the project management

20   and was more involved with that side of it, and I was

21   more involved with more the office stuff.

22        Q.    Did you ever talk to anybody about firing

23   Mitch?

24        A.    No.

25        Q.    What did you do to prepare for the